[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Plaintiff and defendant in this matter intermarried at Bristol, Connecticut, on April 24, 1982. The plaintiff has resided continuously in the state of Connecticut for a period of at least twelve months next preceding the date of the filing of the complaint in this matter. There are two minor children, issue of the marriage, namely Joel A. Gibson, born May 1, 1986 and Kyle A. Gibson, born September 14, 1987. The plaintiff alleges that the marriage of the parties has broken down irretrievably and there is no hope of reconciliation.
There is no question that this marriage has broken down irretrievably based upon all the evidence placed on the record. The parties are in agreement that a dissolution of the marriage should occur and are further in agreement on custody and visitation of the minor children. The parties basically agree that legal custody of the minor children should be placed jointly in both parents with the primary residence being with the plaintiff wife, subject to reasonable rights of visitation in the defendant husband, to include but not limited to the defendant husband having visitation on alternating weekends from Saturday at 10 A.M. through Sunday at 6 P.M. and conditioned upon the defendant husband insuring that the children attend Sunday School at the First Congregational Church of Bristol or in the alternative, allowing the plaintiff wife to pick up the children for that purpose, unless the defendant husband is out of town with the children; further, the defendant shall have visitation on Tuesdays and Thursdays each week from 5:30 P.M. to 8:30 P.M. during the summer school vacation and from 5:30 P.M. to 7:30 P.M. during the school year, on the condition that the CT Page 7807 defendant husband shall insure that the children complete their homework, if any, during the school year; further the defendant husband shall be entitled to two weeks vacation with the children each year, not necessarily consecutive and not necessarily during the summer, with reasonable advance notice of at least 30 days and the defendant husband facilitating reasonable telephone contact between the plaintiff wife and the children and also provided he give the plaintiff basic information as to the children's intended whereabouts, including a phone number; the plaintiff shall also give to the defendant husband like information during the period of time when she vacations with the children aways from the marital home; the defendant shall have the children on Father's Day and the plaintiff shall have the children on Mother's Day. The defendant husband further has the right to have some time for visitation with the children on their respective birthdays. In even numbered years, the plaintiff wife shall have New Year's Day, Memorial Day, Labor Day, and Christmas Eve while the defendant husband shall have Easter, July 4th, Thanksgiving, and Christmas Day, and on odd numbered years, the parties shall reverse this schedule. A condition of all visitation with the defendant is that the defendant husband shall not consume alcohol or drugs immediately before or during the visitation. All pick up and drop off of the children for visitation purposes shall be at curbside of the marital home.
In almost all other areas relative to alimony and property distribution, the parties are in severe conflict. One of the major problems is ascertaining the true earnings of the defendant husband. The defendant is a thirty percent owner of a business known as Quality Controls, Inc., in Bristol, Conn. He is also a one-third partner in a business known as Gibson Brothers Partnership, which owns the building in which quality Controls, Inc., operates in the Town of Bristol and he is also a one-half owner of the building occupied by Quality Controls, Inc., in Town of Pawcatuck, Conn. There is a third business in which the defendant is a one-third partner called Dynalock, Inc. His partners in all of the businesses and in the partnership are his two brothers and also in Quality Controls there are two very small stockholders, that the brothers are attempting to buy out. One of the major problems is that the defendant reports on his financial statement an income of $2,234.76 per week which is his salary as an officer and evidently sales manager of Quality Controls, Inc. However, there is other money flowing to the defendant through the partnership. The partnership, as CT Page 7808 indicated earlier, owns the buildings that Quality Control is located in and receives rent from Quality Control. The rent received goes to pay off obligations of Quality Control and the partnership but in essence is really adding to the assets of the partnership or the individuals and that has not been factored in. The defendant has a gross income of approximately $152,000 per year from Quality Controls, Inc. This included a $26,000 payment from the corporation as a Sub-Chapter S payment. This in turn was partially lent back to the corporation and a note received in exchange therefore. However, the defendant, after deducting all his costs of taxes, retirment [retirement], social security, paying off obligations, brings his net income down to approximately $50,000 per year. The plaintiff insists that his true income is closer to $100,000 per year based upon a gross of $230,000 plus per year. The 1992 return for the parties actually showed a net adjusted income of $237,751. It is interesting to note that $90,000 of this income comes through passive and non-passive income from a Schedule K1 which was not attached to the return but which does show a growing asset of the defendant in the property and businesses he does own.
The plaintiff works part-time as a receptionist in a doctor's office. She is not very skillful in the world of finance and had always allowed her husband to make the financial decisions in the family home. One of the last steps she allowed her husband to take was to talk her into refinancing the family home. This was after the separation, and he told her that he was going to quit claim the house to her and further assured her that her monthly payments would be much lower then they had been under the previous mortgage. In fact, what the husband did was to mortgage the house for $26,000 more than it had been mortgaged for and secured, in return for the old mortgage, a new variable rate mortgage where the rate was very low but could increase or change at any time depending upon economic circumstances and ultimately could increase her monthly payments to exceed the monthly payments under the former mortgage.
The defendant made much about the fact that the company was going through a refinance at the time of the hearing on the dissolution. The refinance amounted to 3.004 million dollars from Bank of Boston. The company Quality Controls, Inc., and the property had been owned by the defendant's father who passed away from cancer around 1989. Evidently the property had been left either in trust for the brothers or to their step-mother. It never became quite clear what the exact legal status of the CT Page 7809 parties were but sometime in 1989 or 1990 the brothers decided to buy out the step-mother's share of the business. The defendant placed on his properties, including the marital home, a blanket mortgage for $300,000. It is not clear whether the $300,000 was his share of the buy-out or was the total sum of the buy-out and the other brothers were also involved or whether this was a down payment, or merely his 30% share. It is interesting to note that if the $300,000 was the defendant's share of the buy-out and that he owned 30% of the stock in Quality Controls and that this also included the buy-out of the property by the partnership Gibson Brothers, that the total value of the plant and the properties, taking into account the 10% owned by the minority shareholders, the total buy-out of quality Controls was one million dollars and three years later it is being mortgaged for three million four thousand dollars which would indicate a substantial increase in the value of the partners' investment in the business during the time of the marriage. Separation between the parties occurred approximately two or three months after the buy-out by the brothers of the stock so that the stock and at least Quality Controls, Inc., and the defendant's share in the partnership fall within the purview of being marital assets. The $300,000 used by the defendant to purchase at least his share of the business included not only a mortgage on other property, but as part of the blanket mortgage included the marital home and the plaintiff wife willingly signed on that note enabling her husband, the defendant to become a partner in Quality Controls and in Gibson Brothers Partnership. The note was eventually released during the pendency of the trial.
Because of the financial machinations involved in trying this case, it is difficult to determine the true income of the defendant. However, looking at the 1992 tax return and other documents placed in evidence, the court is convinced that the defendant is living well beyond his claimed $52,000 per year income. He has the use of a car owned by the corporation, VISA cards which are used supposedly for business entertaining, including several of which were down at one of Connecticut's newest financial enterprises Foxwoods Casino in Ledyard. The defendant claims that these were entertainment expenses incurred during visits to the Pawcatuck plant, which is only several miles from Ledyard where the gambling casino is located.
As earlier noted, the Pawcatuck plant is owned by Gibson Brothers but the defendant's interest is one-half of the CT Page 7810 Pawcatuck plant and this interest evidently came to him sometime prior to the marriage. There are no indications as to what the circumstances were that led to this particular situation. The Pawcatuck plant is not part of the security agreement with the Bank of Boston. Further, the loan from Bank of Boston does not encumber the stock of Quality Controls, Inc. nor the stock of Dynalock corporation. It does secure the rents paid by Quality Controls, Inc. to the Gibson Brothers Partnership which sums would be used to lessen the indebtedness to Bank of Boston. Even though the rents are paid to the Bank of Boston in reduction of the loan, those payments would at least increase the equity of each of the Gibson brothers in the Bristol property which is the subject of the mortgage note and loan encompassed within the loan agreement with Bank of Boston.
In contrast, the plaintiff wife works only part-time as a receptionist in a doctor's office at minimum wages. Her ability to earn more is somewhat questionable. She could increase her income by working 40 hours a week if employment were available to her. Her skills, however, are as bookkeeper-receptionist at a minimum wage level. There is also the problem that by increasing her hours she would have to increase her own costs for day care for the minor children. She would need some form of care for them, at least after school hours until she returns home from work. It would be helpful if the plaintiff could some how upgrade her occupational skills and thereby increase her employability prospects. Based upon her financial affidavit, the plaintiff's estate, other than her interest in the marital home, is minimal and her opportunities for future acquisitions of assets or her increasing her income also seem to be minimal. She has a rather large liability with Master Card which reduces her assets to approximately $4,000 excluding her equity in the marital home. The court would note at this particular point in time that the $300,000 mortgage on the family home was removed prior to the completion of the trial so that her equity would stand at approximately $24,000 or $25,000. That would be a large part of her estate.
On the other hand, the defendant has great potential to increase his income and his estate. The note with Bank of Boston is a five year note and actually could be paid off sooner if business continues as well as it had done in the past few years. In the past couple of years, Quality Controls has shown an extremely large increase in their sales and Dynalock which is operating at a loss still managed to increase it sales CT Page 7811 substantially so that everything is very favorable for these companies in the future in which case the defendant will also benefit. The defendant also, on his financial affidavit, includes retirement payments and health insurance payments to reduce his gross weekly income. He shows a car payment of $128 per week which is for a car owned by the corporation which the corporation should be paying. He shows rent or mortgage of $348 per week on a new house but admits that his girlfriend and her son who reside in that house with him do not share in the rent. His share should actually be $116 per week on a pro-rata basis as the girlfriend also has her child living there. He shows outside meals of $200 per week while his wife and two children show a total of $90 per week for food. He shows clothing payments of $57.60 per week for himself which exactly totals $57.60 which the wife claims for herself and her two children. He bought his new home allegedly so he would have nice place for his children to visit at such times as he exercises his visitation. However, it seems that the cost of a new home is rather excessive when one considers the dire straits he claims to be in because of his inability to net out more money from the $2,200 per week income. Yet he does not show much consideration for his family, considering that his wife is showing a $500 shortfall on a $158 gross income per week. There is absolutely no doubt in the court's mind that the wife has to increase her vocational skills so that she can increase her income and be more independent from her husband. Moreover, there is in the court's mind that the husband has to help her attain this goal so that in the future she can be independent of him and he still must meet his obligations to support his children in the interim. This is going to be extremely difficult for him when he claims almost a $300 per week shortfall in his net income and expenses.
Beyond all the financial differences, between the parties, there is also the fact that probably the major cause for the breakdown in this marriage was the defendant's heavy drinking habits. The wife asked him to seek help in overcoming his problem but he did not. When she could no longer tolerate the situation at home, she spoke to him about a separation and his response was to "go all the way and get a divorce," indicating that he had no desire to continue the relationship. The blame for the breakdown of the marriage would be more his actions than the actions of the plaintiff.
Further in looking at the defendant's financial affidavit, CT Page 7812 it is readily apparent that based upon his weekly income he is overwithholding both on his federal and state income taxes and that these withholdings come out to approximately $223.59 per week. Further, he is withholding $178.78 for retirement which basically is a form of saving. This should come out to about $402 added to his net weekly wages of $985.43 as he shows. His net weekly wage should really be $1,388 or more per week. Adding in the wife's weekly income puts the parties at $1,524.97 a week net income which is slightly above the maximum guidelines set for support for the two children. Using the guidelines, however, the weekly support for the children totals $512.54. The wife's net income is approximately 10% of the defendant's which would reduce the defendant's share of the support to $461.26 per week. However, this is a case where I believe the 15% deviation would very well apply and would accordingly order the defendant to pay $530 per week as child support for the two minor children.
Further, since the wife is going to be in need of some form of assistance to get her to a higher skill level, the court would order rehabilitative alimony to the wife in the amount of $300 per week for a period of two years, to be reduced to $200 per week for a period of two years, to be reduced to $150 per week for a period of one year, or a total of five years of alimony. As was indicated earlier, if the wife attains full time employment or attends school or classes to obtain higher vocational skills, day care will become necessary for the children, even after school hours, and during vacations and summer recess. The parties shall share such day care expenses at the rate of 60% paid by defendant and 40% paid by plaintiff, if she is attending school to better her vocational skills. If the plaintiff is working 40 hours per week or is otherwise gainfully and fully employed, the payments for day care shall be divided equally between the parties.
The next matter for consideration is distributing the estate of the parties which consists of the family home at 210 Ashley Road West, Bristol, Kemper IRA's, a 401 K and stocks held by the defendant. The court is going to order in accordance with the defendant's agreement that the defendant quit-claim all right, title and interest in and to the property at 210 Ashley Road, Bristol, Conn., to the plaintiff. The defendant shall futher [further] reimburse the plaintiff wife the sum of $26,173 — the amount he took out on the refinancing of the house. For five years from the date of the dissolution, this obligation shall be CT Page 7813 secured by a second mortgage and note on the defendant husband's property at 54 Mandy Lane, Bristol, Conn. and shall represent family support and be non-dischargeable under any bankruptcy proceedings. Said mortgage is to carry interest at 8% per annum. The mortgage shall be payable at the rate of 20% of the principal per annum. The plaintiff wife shall be entitled to retain her Kemper IRA for $3,661.50 and the defendant husband shall transfer his 401K to the plaintiff wife. The defendant shall also transfer his $20,313 IRA to the plaintiff which shall then be cashed. The parties shall withhold a sum equal to 31% of the value of the IRA for estimated taxes and the balance shall be equally distributed between counsel for the parties which will constitute full satisfaction of the defendant husband's obligation to contribute toward the plaintiff wife's counsel fees. If there is any tax liability owed beyond the amount withheld, the parties shall share equally in said tax liability. If there is a sum left over after the tax liability has been met, the sum left over shall be disbursed equally between the parties.
The husband shall further cooperate with the wife in either reducing the current first mortgage on the family property or at least convert it to a fixed rate mortgage for a period of twenty or thirty years, whichever the plaintiff feels she can handle. If the plaintiff so desires, she may forestall any refinancing until the defendant has paid her the $26,173 and use that to reduce her mortgage at the time of refinancing not more than five years hence.
The court has no idea as to the value of the Quality Controls, Inc. stock but the defendant husband shall be allowed to retain his full interest in said stock but in lieu thereof he shall transfer to the plaintiff wife one-half of his share in the stock of Dynalock Corp. which was obtained by the defendant after the separation but is being considered in lieu of the Quality Control stock which was obtained during the course of the marriage. The defendant husband shall maintain the plaintiff wife and minor children as sole equal beneficiaries on a life insurance policy of $1,000,000 until the parties' youngest surviving child reaches the age of eighteen. The defendant shall further maintain the two minor children as beneficiaries on a policy for medical and dental insurance equavalent [equivalent] to Blue Cross and Blue Shield for a maximum period of time allowed by the policy but in any event until each child reaches the age of eighteen. The defendant shall make CT Page 7814 available a similar medical insurance policy for the plaintiff wife under the terms of COBRA and the parties shall equally divide all uninsured or unreimbursed medical, dental, optical, prescriptive and counseling expenses incurred on behalf of the minor children until they reach their majority.
The defendant husband shall be entitled to claim both minor children as dependents for state and federal income tax purposes as long as he remains current in his child support, alimony, life insurance and unreimbursed medical bill payments and obligations for the tax year in question.
The plaintiff wife may retain as her property exclusively all the contents located in the marital home except the following items which the defendant husband shall receive: hand tools (except for a reasonable quantity necessary to maintain a home and the garden/yard tools to be retained by the wife), a golf pull cart, a fair share of all family photographs, including the defendant husband's parents. The defendant shall return to the plaintiff a computer and software, a coffee table, sleeper sofa and roll top desk.
Accordingly, the court will enter a decree dissolving the marriage, and orders for custody, support, alimony and the distribution of the marital estate as hereinbefore set forth.
M. Morgan Kline, Referee